We'll hear argument this morning in Case 16-149, Coventry Health Care, Missouri v. Nevils. Mr. Estrada. Thank you, Mr. Chief Justice, and may it please the Court. The issue in this case is whether FEBA preempts State laws that forbid subrogation by insurance carriers. The Missouri Supreme Court upheld the State rule, but we believe that is wrong for at least three reasons. Number one, anti-subrogation laws relate to benefits and coverage, as this Court concluded in FMC v. Holiday, and at the very least, they relate to payments with respect to benefits. Number two, if there is any ambiguity on this point, OPM's notice and comment regulation answers the question in favor of preemption. And number three, although the majority of the Supreme Court of Missouri thought otherwise, we believe there is no constitutional infirmity in Section 8902M1 under the Supremacy Clause. If I could turn to my first point, it seems to us that the anti-subrogation rule in this case is preempted for basically the same reasons this Court considered in FMC in concluding that the same rule was preempted under ERISA. That is to say that it effectively requires plan administrators to calculate benefits on the basis of different liability conditions that vary from State to State, that very importantly, it undermines the statute's goal of uniformity, and third, that it could encourage plan sponsors, in this case the Federal Government, to reduce the scope of coverage. In addition to those reasons, this statute gives you an additional reason to find that it is preempted, and that is that it also preempts those rules that relate to payments with respect to benefits. It is quite clear to us that the subrogation and reimbursement claims that are at issue in these rules quite plainly refer to and relate to payments with respect to benefits. And therefore, the Supreme Court of Missouri was wrong in overlooking that part of the Is there any room at all for State regulation of carriers who have these contracts with OPM? Well, to be sure, the statute, if you focus on the last clause, now, the statute appears in page 2 of the blue brief. If you focus on the last clause, the statute only reaches those State laws that, quote, relate to health insurance or plans. And there are any number of subjects that may not be reached by these laws or by other laws, and also subjects that are not related to benefits coverage or payments with respect to benefits. Congress dealt separately in Section 8909F with the subject of taxation in the context of these plans, and generally provided that carriers may be subject to generally applicable laws that are applicable to all businesses on their profits and the like, but that States may not tax the benefits and the payments. And so Congress has, in fact, crafted a limited preemption provision that singles out those laws that are most likely to apply to the insurance plans at issue, and then only said that the scope of the preemption would be defined by particular terms of the contract. And so, in our view, in some ways, the reach of this law is somewhat more limited than the that of the ERISA statute, because although the relate language is identical and they should have identical scope with respect to benefits coverage and payments with respect to benefits, it does not reach all laws of the State. It targets, to begin with, only the health insurance, those laws that relate to health insurance or plans. Now, if I could get to the second point, we recognize that — Kagan. Before you do, I mean, we appeared to find this a difficult question in McVeigh. We said there were two plausible readings. We said it was a hard statute. We didn't want to decide as between the two. You know, what do you make of that case? Martinez. I actually was going to be the headline on my second point, Justice Kagan, so thank you. You know, we recognize that McVeigh considered the same statute and concluded that the statute did not give rise to a cause of action in Federal subject matter jurisdiction. And we believe that that question was indeed difficult, because unlike ERISA, where Congress expressly provided a cause of action in Section 502 of that statute, Congress had not done so here, and the Court was basically being asked to imply a common law cause of action out of the terms of what otherwise appears to be a defensive preemption provision, which is relatively rare. The background rule in the Federal system is that Federal preemption is a defense only, as we learned in the Motley case, and the difficulty that the Court had was in transforming what otherwise would be a defense into a cause of action and implying Federal jurisdiction. I think that context is extremely important to understand the Court's caveat as to the text of the statute, because the question then was whether the statute would bear a construction that was expensive indeed with respect to an entirely different subject matter. With respect to the question of whether the Court considered the statute as being susceptible on the merits of the defense to possible alternative constructions, I think if you look at the relevant passage, what the Court said was that different on the one hand, one by the United States, and on the other hand, another one by the Cruz plaintiffs out of the Seventh Circuit. The Court described both of them generally as plausible, unwrote to saying that it didn't have to pick either of them. We do not believe that that sort of description of the litigant's position really rises to the finding that the statute is ambiguous as a threshold for even a Chevron analysis, because the Court was not considering any canon of construction, was not considering context, was not considering purpose. It was simply describing the position of litigants in front of this Court and concluding that it was unnecessary to pick one or the other. Kennedy, in this case, you have an express preemption provision. You have a Federal entity that makes the contract. So that may be all you need to say in order to prevail. But there are some limiting principles that we should just be in the back of our mind when we think about preemption. The case in Boyle was, I think, a close case, completely different from this because there was no express preemption. So it's not really your obligation to direct, to address a parade of horribles that isn't in this case. But are there some general limiting principles that we should keep in mind when determining whether or not a preemption, A, exists and B, is permitted? Well, of course. You know, you have really three headings of preemption under this Court's doctrine. You have conflict, where you take the text of the statute and decide whether the state rule actually conflicts, as the label says. And I think that's the common form that comes in front of the Court. And I think that's just a question of ordinary statutory interpretation, applying all the relevant canons, and considering as well the purpose of Congress. The harder cases are ones like Hilsman v. Marietta, where you're not dealing with actual language of the statute, but you're considering whether the state law is an obstacle to what Congress wanted to get at. And this case does not involve that problem, except as an a for sure-I type argument as to how this would be out even under that rule. But the easiest case seems to me to be what you have here, where Congress had exercised an appropriate level of Federal power under section — under Article I, Section 8, and then has gone further by itself declaring what it views as the consequences for the Federal-State balance. And in this context, it seems to us that it is especially inappropriate to consider what the conceivable limits would be of a doctrine that arises practically in every case. Roberts Well, maybe one doctrine has to do with the delegation issue. Suppose Congress passed a law that said, well, any professional responsibility — any professional responsibility rule adopted by the ABA will preempt contrary State law. Is that okay under preemption doctrine? Estrada Well, it seems to me likely not, but let me take apart what I think are the key aspects of the consequence of the — of that answer. First, Congress has to identify a part of Article I, Section 8 that gives it a head of constitutional authority to do what you just described. Second, to my view — Roberts Well, you're just — are you just saying this is beyond — regulating the Federal profession is beyond Congress's power? Estrada Well, as described, it's not self-evidently connected to any one of these. Roberts All right. Well, assume it is within Congress's power to legislate. When then there is a question of identifying what it is that Congress is trying to do, it is, in fact, true that Congress has adopted what otherwise would be State — State rules for the government of certain issues. You know, you have things like the — like the assimilative crime statute, for example. And, you know, the question is how closely it is tied to the relevant heading of power, and then whether Congress has provided enough governmental supervision for the activity so that it is subject to a delegated exercise of power under appropriate standards by an ultimately responsible official. Roberts Well, I guess, is it — you know, in some of those areas you're talking about State governments, is — is it permissible for Congress to delegate the authority to decide what laws are preempted to a private entity? Estrada I think it depends on how it does it. I would be reluctant to say that considering whatever crisis or problem Congress may be considering, that there is a particular avenue of dealing with them that is completely foreclosed, but to the extent that there are limits to the ability of Congress to do such things, it seems to be that a precondition for Congress' ability to do that would be to do something like has happened, for example, in the securities markets, where you have what are called self-regulatory organizations, where trade groups, in effect, have rules that apply to parts of the industry, but they're strictly supervised and approved by the Securities and Exchange Commission, and there is recourse for their violation to go in Federal court. Now, those rules in some cases are considered preemptive, and so I don't want to foreclose, you know, the proposition that as a category, using an industry group or a private group, so long as it is subject to appropriate government supervision, could not be a possible tool that Congress could use, but in that event, if I could just finish, but in that event, you would also have the additional layer of involvement having to do with the limits that this Court itself has placed on the delegation by Congress of any authority. You do have something called the non-delegation doctrine. Robertson Well, what about two private parties, whether they're, you know, whatever they are, a railroad and a shipper, in other words, and Congress says whatever you agree to will preempt contrary State laws? Now, I know you're going to suggest it's not this case, but assume it is. Estrada No, no, I understand that. I understand that, Mr. Chief Justice. I find it hard to believe that Congress could lawfully give a blank check to private individuals without any subject, without any government supervision, and or without appropriate standards as to what it is that they may do or not do. But I want to distinguish the hypothetical that you posit from what's at issue in this case. Robertson Well, before you get to that, I mean, it would seem to me that you could deal with the concerns you have and still address the problem. In other words, it's not a blank check. You know, at any rate between, you know, $10 per mile and $30 per mile. But you, the parties, you know, we want to give the free enterprise system a little more scope than having the government set it. So whatever rate you set between $10 and $30 a ton or a mile will preempt contrary State regulation. Estrada No. Again, it seems to me that this is a question to some extent of conceptualizing. I think I am agreeing with the basic premise of your question, Mr. Chief Justice, that there are, of course, limits to the ability of Congress to delegate to private companies. Breyer But the question, I think, which is perhaps purely speculative, but it is rather interesting, if we go back to the sick chicken geschechter, the first is a question of whether Congress has the Article VIII power to legislate at all in the area. We assume the answer is yes. The second is a non-delegation question. There, delegation had run riot, but suppose they had used the words unfair competition instead of fair competition. And therefore, they had satisfied the non-delegation doctrine. Given satisfaction of the source of power and satisfaction of the delegation doctrine or non-delegation, is there an additional requirement? Does the preemption matter, assuming there were parts of that that preempted as there must have been, is that a separate doctrine that imposes yet a further restriction, or once the first two are satisfied, have you automatically satisfied the third? I find it hard to say that there is an independent limit on the basis of a preemption because, as I understand the power of Congress, Congress could pass a statute that displaces all law in a subject matter and renders it a law-free area, for example. And so I don't know that I would ever say that in dealing with a crisis like the Great Depression, for example, Congress could not turn to the type of remedies that it tried in the Schecter case and that those would be completely foreclosed to Congress. But the idea, the concern is, raised by your friend on the other side, is, yes, Congress can do that. But we're talking about the preemption of State law, and the question is whether or not they've authorized someone not subject to the political constraints that Congress is subject to, to undertake that pretty significant step of telling State legislators that they can't legislate. But if I could just pivot to what why the argument doesn't really fit what the problem is that we have in this case, even though it is preemption, is that it arises ostensibly because the statute literally says that the terms of the statute would supersede and preempt. It is quite evident from the statute that what Congress actually intended to say, and the words will bear, is that the terms of the statute shall be effective notwithstanding the contrary, et cetera, et cetera, and that although I understand that the whole delegation going down, you know, the road of delegation is very interesting, I will point out that nowhere has a delegation challenge as such been raised in this case in any of the lower courts, and that it was only in this Court that this was reconceptualized as that. I think the proper way to conceptualize what Congress has done in this statute, as it has in many other statutes, is that it has displaced State law to create room for the operation unimpeded of certain contract terms that it believes should be encouraged for the public interest. The Federal Arbitration Act is one example of that. Even though it is a purely private statute, you know, the statute that we were mentioning earlier, ERISA is another. I will simply say that if Congress can do that to make room for the operation of purely private contracts, a context that involves Federal benefits for the Federal workforce and the Federal contracts administered by a Federal agency is something that Congress can clearly deal with, because under Clearfield Trust and its progeny, these contracts would be governed by Federal common law in any event, and that law will be preemptive at least in certain circumstances. So it is certainly appropriate for Congress to identify itself the outlines and limits of the preemption than to leave it to ad hoc adjudication of common law claims by the Federal courts in this country. Thank you, Mr. Chief Justice, and I would like to reserve the remainder of my time for rebuttal. Roberts. Thank you, counsel. Mr. Tripp. Mr. Chief Justice, and may it please the Court. OPM's regulations answer the question presented here, and I'd like to just make three points about how they work, why they're important, and do you think this is ambiguous? Why do we get to Chevron deference at all? I guess our basic take is that the answer to that doesn't really matter, because we've picked one of the two interpretations, and it's really up to Respondent to show that our interpretation is not even reasonable, and we think that there's just no way that they can do that. Our interpretation, we think, is just a better interpretation, if you're choosing among the two. So why is the agency, better than a court, suited to define its own jurisdiction? So that's what I was wanting to get at in explaining how these regulations work. And so I think the key point that I want to emphasize here is that in the preemption provision, the crucial language is what is the nature and extent of the benefits and benefit payments available under one of the plans, and that is tied to something OPM is already administering under a different provision of the statute. 8902d says that each contract shall include such benefits and limitations and other definitions of benefits as it considers necessary or desirable. So those two things go hand in hand, and the regulations, they work the same way. In section B-1 of the regulations, it says that subrogation imposes a condition of and a limitation on benefits and benefit payments, and that makes good sense. It's a clawback provision. Roberts You've already you've just slid into the Chevron question, right? I understood Justice Sotomayor to want to know if you, well, at least I would want to know, do you need Chevron to get around the ambiguity? Because once you say that, it's you get into somewhat serious questions about whether Chevron applies, basically, to the decisions of private entities to, I mean, I think the concern is it's bad enough that they're preempting State law, but now they get deference. They can preempt State law so long as their terms are plausible. So I think we would win this case even without Chevron deference, without the regulations. I think we just have the better of the two readings of the statute. The application of the presumption against preemption here I think is really just fundamentally misguided. Not only do we have an express preemption provision, we're talking about Federal benefits for Federal employees under Federal contracts entered into under a Federal statute. And the way this would work on the ground is if Missouri can prohibit subrogation, then what happens is that Federal workers in Illinois who are enrolled in the same plan and paying the same premiums are footing the bill for benefit payments they can't even keep. And it's not part of a State's traditional authority to impose those kinds of externalities on out-of-State Federal workers. So what I was getting at in the answer to Justice Sotomayor's question is that we would clearly get deference here on 8902d in determining what are the definitions and other limitations on benefits available under a plan. And I think under Chevron, it doesn't make much sense for us to get less deference in determining what is the nature and extent of benefits and benefit payments, because it's really just another way of saying the same thing. So on why it's important, I think I covered this a little before, but to be very concrete about this, in the D.C. metro region, Virginia prohibits subrogation, but Maryland and the District of Columbia do not. Under Respondent's position, similarly situated Federal workers working for the same agency, enrolled in the same plan and paying the same premiums would have different benefits and the different extent of benefit payments depending on whether they live in Bethesda or McLean. I think that's just clearly wrong. And then on the customer's side. Roberts, you understand the problem, and I understand the argument that it's semantic, but sometimes semantics matter. If you wanted to take care of that problem, you just have to pass a law saying that the State laws are preempted. But you don't. It says that the contract is what preempts the State laws. So and I think what my brother said was exactly right. If you just turn to the statute, I'd like to illustrate why I think it really poses no constitutional problem at all. It's on page 2 of the Blue Brief or page 3 of the Gray Brief. It says that the terms of these Federal contracts shall supersede and preempt State or local law relating to health insurance or plans. What that clearly means is that the terms of the contract shall apply notwithstanding State or local law. It's a non-abstante provision like the Supremacy Clause itself. And I think when you read it that way, it makes it crystal clear that the statute is doing all the preempting here. It's creating a protective umbrella to enable OPM to do that. Roberts, if you edit the statute, it's perfectly clear. It doesn't say or it says preempt. And I think what I was getting at is I think it's a perfectly natural reading of shall supersede and preempt to interpret that to mean shall apply notwithstanding because the Supremacy Clause itself has similar language about notwithstanding. We think that's obviously what Congress was getting at here. Every other Federal benefits, general benefits, general Federal benefits statute has this same language. So it's health insurance, life, dental, vision, long-term care. We don't think that there's any problem in picking this particular language. If there are no further questions. Roberts. Thank you, counsel. Mr. Wessler. Thank you, Mr. Chief Justice. May it please the Court. A decade ago in McVeigh, this Court stressed that FEBA's express preemption clause requires cautious interpretation. That instruction remains true today. Section 8902M1 was, in Congress's own words, purposely limited and not designed to disturb the important role that States play in regulating those private insurers who participate in the FEHB program. Indeed, that is why when Congress first enacted the provision, it specifically warned that the clause would not preempt insurers from traditional State laws governing insurance. Reading FEBA's express preemption clause narrowly here so that subrogation contract terms do not preempt otherwise applicable State law honors Congress's intent and accords respect for the States as independent sovereigns and their historic role in governing matters of insurance and court law. Does the statute 8902M1, does it preempt anything? Well, we think that the statute is unconstitutional under the supremacy clause, and so as written, it has to have no effect. I think if you carve that out for one second, I think what Your Honor is asking is are there a subset of laws that Congress was attempting to displace by virtue of these contract terms. And I think the answer to that is yes, and you can get that from the legislative history. There were at one – I think just to back up for a second, when Congress first passed FEBA in 1959, it did not attempt to enact a uniform area of Federal law. And you know this because what Congress said when it first passed the law was there is a problem with Federal workers. They don't have the same competitive Federal benefits packages that those in the private sector do, and we want to create a competitive way to allow them to entice them to work for the government. But they also had a problem because the government wasn't administering any sort of serious health program. And so what they chose to do was to tap into the private market. They explicitly said we don't have the expertise to administer this program. We'd like to act as a market participant and buy these plans from private insurers who are doing business in the States. And so from its inception, the FEBA program was a dual regulatory scheme. Congress intended States and their insurance laws to govern those private insurers who are participating in the program. Now, in the 70s, what happened was that a number of the carriers and the agency administering the program, which was then at the time called CSC, found that there were a number of States that had begun to pass benefit laws, State laws that required, for instance, a carrier to cover acupuncture services or chiropractor services. And the carriers went to Congress and they said, these laws pose a problem. We need you to address this in some fashion. And that's what Congress did with 8902m-1. But it was very clear in the legislative history at the time it passed the statute in 1978 that it was purposefully limited and not intended to displace the State background insurance laws that would apply to all of the carriers participating in this program. Alitoso, before we get to the legislative history, could you say something about the terms of this provision? Would you argue that the terms of a subrogation of a contract that has a subrogation provision do not relate to coverage? They do not relate to benefits? They do not relate to payment of benefits? Could you explain how you would reach that conclusion? That's right, Your Honor. That, we think, is the best reading for three reasons. First, it makes sense to distinguish subrogation from benefits because subrogation claims involve the proceeds of a distinct and separate tort cause of action that happens distinct in time and is highly contingent. It doesn't involve any — it doesn't affect at all any payment for a benefit or a coverage that a Federal worker might receive from their — It doesn't affect the benefits that the participant receives? That's right. If there's no subrogation claim, the benefit receives a certain amount. If there is a potential — if there's a requirement of subrogation, the participant receives that amount minus X. I don't think that's quite right, Your Honor. They get the — a Federal worker, let's say, who needs coverage for an MRI, gets that MRI covered and gets the coverage for that MRI paid for by her insurance plan, regardless of any subrogation claim. Right. Because that claim is necessarily contingent and may never occur. And the money that ultimately is involved in a subrogation claim isn't the money that is getting paid for, for the MRI coverage. It's money that comes out of a separate — the proceeds of a separate tort claim from a personal injury action. Well, money is money. I mean, you know, $1 is as good as the next. And the question is, I think what Justice Alito is saying, I'll just say it my way, is one way, say you're in a car accident, one way you get all the hospital and medical costs that you incur, and the other way you get those costs, minus any recovery in a tort suit. So maybe a recovery won't happen in a tort suit, but a recovery might happen in a tort suit, and then you get considerably less. Well, I think — I think that that is certainly possible, although I do think the money matters. These are historically equitable claims, and the pots of money and the differences about from where those monies come matters in the way you conceive at the outset of what a benefit is and whether that benefit will be covered. But I also think that part of understanding how to interpret the text of the statute requires understanding what Congress intended when it passed it in the first place. And I think the purpose here is that Congress was distinctly concerned with these kind of front-end benefit laws that made it difficult for carriers to know and provide for the coverage that they wanted and not to be required to cover for Arizona's acupuncture doctors' benefits and services that weren't offered under, for instance, a Blue Cross Blue Shield plan. Breyer's point is, is your point, look, what we're talking about here is subrogation has nothing to do with coverage. It has nothing to do with benefits. You're covered. You get the money. You get the CAT scan. You're covered. You get the hospital payment. You get the pain and suffering or whatever. You're covered. Now, there's a different thing that happens in the world. There's a tort suit. And our law affects the proceeds of that tort suit. The proceeds of that tort suit are not benefits. The proceeds of that tort suit are not coverage. The proceeds of that tort suit are some money that our State and a judge decided should be paid to a victim of an accident. Is that the point? That's correct, Your Honor. Well, if that's the point, then what about payments with respect to benefits? The sub --"those payments are not even with respect to benefits"? Again, I don't think that's the best reading of the statute for largely the reasons that Justice Breyer gave. The benefits and the payment of those benefits contemplates a front-end question about whether you are getting your MRI covered by the plan, not whether many years down the road there is some additional extra pot of money that is then available to be shared among a number of different entities. But the question isn't whether it's benefits. It's whether it relates to benefits, and not even whether it relates to benefits. Whether it relates to payments with respect to benefits. Yes, I think that's certainly right, but I think relates to, again, is context dependent in this for this statute as it is for every other statute. And Congress had a laser focus when it passed this statute in 1978. It did not want to disturb otherwise applicable State insurance laws. And the reason it didn't want to disturb those laws is because it understood that the private carriers that were participating in this program should be governed by the same laws that would govern anybody in the private sector when it comes to insurance. And that's why this distinction, I think, is a false one between an employer an employee in Missouri and an employee in Kansas getting different rights because their State laws are different. That is precisely the kind of differences that Congress wanted to ensure controlled in the FEHB program. I think also, you know, what this points up, Justice Alito, is that there is, I think, this textual ambiguity that certainly can be read based on just a pure matter of text. Breyer. Breyer. There's no ambiguity. The answer to the point, if I got the point right, is you say, you know, it's sort of like a lottery or something. There's some money floating out there. And what the contract says, different from what the State law says, is that money that's floating out there, maybe you won it in a lottery or it came from Mars as far as this receiving benefits is concerned by the patient, but this contract says you take that money that came from Mars or wherever and you pay it to the insurance company. Why do you pay it to the insurance company? Well, I think the answer is because the insurance company did that entitles them to receive that money from Mars. What is it that they did? Well, they included in their contract this requirement. No, no, no. I mean, just very simply, in three words, what did they do that entitled them to money from Mars? Sure. They paid the benefits. Exactly. So there we are. Now, it relates to benefits because they get the money from this separate thing  So now how do you say that this contract does not relate to benefits? Well, Your Honor, I think, again, the question is largely what did Congress intend when it passed this statute. The question relates to could be read uncritically broadly or it could be read narrowly. And the proper approach, I think, as this Court has explained in multiple different contexts, is to ask what did Congress intend when it passed this particular express preemption clause. And here we know that their goal was not to create an expansive form of preemption that could extend to cover laws that would fall within traditional areas of State insurance regulation. How do we know that? They said in the legislative history, it is purposely limited and not intended to displace otherwise applicable State insurance laws. You know, our colleague, Justice Scalia, is not here any longer, but he would be having a fit at this point. So maybe he would be having a fit at this point. Sure. I understand, Your Honor, but again, I think in McVeigh, one of the lessons in McVeigh is that there is this textual ambiguity that arises from precisely this colloquy that we've had. And the question then becomes, what does the Court do in the face of this textual ambiguity when we don't quite know what Congress may have intended exactly? And in the area of traditional State regulation, as we are in when it comes to insurance, there's a real question.  And so, in order to enforce those State laws, we require a clear statement from Congress before we unduly or cavalierly wipe away. Sotomayor, what is how do you differentiate our holding in Hillman? How is this any more or less relates to than in Hillman? Well, I think almost identical language, and we read it very, very broadly. Well, the critical distinction, Your Honor, in Hillman is that Hillman was decided on an implied form of preemption. The Court, FEGLIA, the life insurance statute at issue there, included an express preemption clause. But the Court didn't address the effect or meaning of that clause at all, and instead looked to the statutory language and the regulations that the agency promulgated and found that a Virginia State law that would have required something else other than what the statute required was in conflict. Now, we think implied preemption Why isn't there a conflict here? We think that there There's a direct conflict between what the benefits paid here demand, its benefits minus later subrogation, and what the State law says, which is you can't honor that contractual term. Sure. So one thing to say, first, I'll answer your question, Your Honor, but this is not an implied preemption case. Neither the Petitioners nor the government have argued that there is a conflict that has been created that gives rise to a form of implied preemption. Their argument is focused solely on the meaning and scope of this express preemption clause. Now, there could be, down the road, if the government were to, in fact, enact a substantive regulation, some form of implied conflict that could give rise to the displacement of State law. But we're not in that world in this case today, and I think that's actually a crucial point that what we have here is the challengers are asking for what is, in essence, an unprecedented expansion of Chevron, at the same time while trying to smuggle in insurance laws through an express preemption clause, when they have available to them the possibility of arguing, as in Hillman, an implied form of preemption that would still allow the Court to do the to make the decision about whether there's indeed an irreconcilable conflict. So I do look at it like this. Kennedy, that gives me whiplash. All of a sudden, you have implied preemption and that's the preferred argument to express preemption? It should be just the other way around. Well, I think, Your Honor, that is what happened in Hillman v. Verretta. And there was an express preemption clause like there was here, but the Court, you know, instead of considering whether that express preemption clause displaced Virginia law, adopted a form of implied preemption to decide whether there was a conflict. But we don't have here a substantive regulation. But it just seems to me an orderly proceeding for us to ask the first question, is there express preemption? And that displaces the whole necessity for going through the very difficult exercise of implied preemption. Well, I don't know. And you seem to indicate that it has some priority. That was my only comment. Well, I don't know that – I don't think there's necessarily a priority, but I don't think the express preemption clause in this case can bear the weight of the interpretation that the challenges in the Crimean case place on it. But, for example, just a couple of years ago, we said with respect to an express preemption clause, we said that the presumption against preemption just didn't apply in a case like this, like that. That it was only applicable in a case of implied preemption. Right. Well, I don't think this Court has overruled the 70 years of precedent establishing that the presumption against preemption applies to express preemption clauses. I think – So that was just a careless statement in your part? No. I think that – I think in that case, the point the Court was making was that where the language of an express preemption clause is clear, where we know that Congress intended to displace a particular State law, the presumption does not need to apply. And I think that's perfectly consistent with an interpretation here that where the text is ambiguous, where we do not have a clear statement from Congress that it intended to displace some particular area of State law, that we would – we would exercise caution and not cavalierly displace that State law unless and until Congress makes that intent clear. I'd like, if I can, to just turn to Justice – Chief Justice Roberts' question that he posed to the challengers about the very odd nature of this express preemption clause, because I do think it raises some very serious constitutional problems that – that if – if – if – if – if there is a presumption that if this Court were to adopt the challenger's interpretation, would – would allow these contract terms to really do the displacing of State law. And I do think that there is – it would be unprecedented. Congress has never enacted another form of this type of preemption that would actually authorize the terms of privately negotiated contracts to step in and displace otherwise applicable sovereign decisions of States. And there really is no way around this problem in the case other than to adopt a narrow interpretation of what the – relates to benefits means, because Congress, when it wrote this statute in 1978, unambiguously intended to delegate the power to preempt to these terms of contracts. And these contracts are not laws under the Supremacy Clause. Alitoso, does your argument depend on the wording of this provision? Does it depend on the fact that it says the terms of the contract shall supersede State or local law? Would – would you have a – would you make the same argument if it said this statute hereby supersedes and preempts any State or local law that conflicts with the terms of the contract? I think that is – I think that is a – a – a far better approach that would – would likely not raise these problems, because it points back to a statute that actually does the preempting. Well, boy, if you're willing to concede that, I don't see what there is to your argument, because that's, in essence, what this is – what this is saying. But the difference, Your Honor, is that here the terms are – the terms of these contracts are determining the scope of preemption. And the terms themselves are – are not known by Congress at the time it passes the law. What Your Honor suggested looks a lot more like what ERISA looks like, where Congress said the subchapters of ERISA preempt or any State law that might interfere with plans. But when – when this Court does a preemption analysis under ERISA, it refers back to the – to the actual substantive provisions in ERISA to determine preemption. Alito, Congress doesn't know the term – doesn't know what's in all these plans. They didn't know what would be in all these plans when they enacted it. No, that's the question. It depends on the – on the formulation. If you say the contract preempts anything that conflicts with State law, that's – that's a problem. But if it says this statute hereby preempts anything that conflicts with the contract, that's – that's not a problem. Well, it depends on what the statute says. And in ERISA, when Congress passed ERISA, it included a series of substantive provisions that dictate which State laws are displaced. For instance, it has reporting requirements, it has disclosure requirements, it has a remedial scheme. All of those substantive provisions give force to the preemption of State law. Here, there isn't any of that. All Congress has said is we're – we are authorizing these contract terms, cite unseen, that are entered into by the government, not acting as regulator, but acting as – as market participant, and the terms of those contracts are able to – to displace otherwise applicable sovereign State law. And it – and there truly is no limiting principle if, in fact, that is authorized under the Supremacy Clause, because as the Chief suggested, there would be nothing to stop Congress from doing the same thing for completely private contracts or the rules of some informal body. When the Supremacy Clause speaks of a law being capable of displacing the sovereign decisions of States, it requires that there be some accountability checkpoints, some procedural protections that safeguard States from the kind of arbitrary decision-making that could occur through an informal process where there's no public participation and no judicial oversight. Kagan, I think I don't quite understand. Your – your answer to Justice Alito's first question, I think he gave you a statute, something along the lines of this Federal law preempts and supersedes any State law that conflicts with these kinds of contracts. And you said that would not be subject to your constitutional concerns. Is that right? Katyala, I may have misheard – I may have misheard Justice Alito. Because those contracts are just as indefinite as the – as the contracts in the statute written here. That's right. And the key point, the one that I think might infect a – would infect that hypothetical is that where the contract terms themselves are determining the scope of preemption, where they – the terms are actually requiring State law to yield, that is where I think the Supremacy Clause comes into play, because those contract terms themselves are not laws. They have not been enacted by Congress. They come with no safeguards, procedural protections. But that's – that, again, is true of ERISA, too. ERISA is a statute that says this Federal law displaces these State laws because they conflict with a bunch of contract terms. Well, I think the difference is that when this Court does preempt – when this Court considers preemption in ERISA, they – the Court looks to the substantive provisions of the statute. It looks to, for instance, the remedial scheme. It says there is this remedial scheme in ERISA, and that substantive scheme displaces a State common law claim. The same would be true for a disclosure requirement. It doesn't – it doesn't specify everything that's in a State – in a plan. And things that are in a plan that are not required by ERISA are – supersede State law. Isn't that true? That's true. But what happens then is you have Federal common law that comes in to fill the gap. What we know from McVeigh here is that we are not in a Federal common law context. These contract terms, the ones involving subrogation and reimbursement, are not governed by Federal common law. They are distinctly State law controlled. They arise after a personal injury happens in a State and through a tort action in State court. They're governed by these distinct State law rules, not any Federal common law. And so the difference here is that you have what is otherwise a State-focused area of law in which these terms in Federal contracts that go through no oversight, no public participation, are being used to deflect those State laws in a way in which Congress itself does not have any control over. And I think the Court ought to be very careful before wading in to whether, in fact, that is something that is authorized under the Supremacy Clause. And I think it's what motivated this Court in McVeigh to look at this exact provision and express what is, I think, a quite concerned view over whether there is the Supremacy Clause problem. Alito, I think Mr. Estrada referred to this situation. What if Congress says that in this particular area, States cannot regulate at all? The free market has to govern. So any State law that purports to regulate in this area is preempted. Now, is there a problem with that? I think that the – I think if you are in a world where there's field preemption, where Congress has displaced everything, you might not run into this problem. But I don't think that's what we're talking about here. You might not run into the problem. You might run into the problem. I think, again, it depends specifically on what the Federal law says and how it's operating. But the closest example that the challengers have come to for an analog to what Congress has done here is ERISA, which refers specifically to the subchapters of the law as doing the preempting, and the Federal Arbitration Act, which itself only establishes a Federal rule of nondiscrimination. It seeks to put arbitration agreements on the same plane as other contracts and have What's going on here is a rule of essentially priority in which Congress has delegated to these contract terms the power to override State law and exist above what would otherwise apply to – in the private sector. And I think that actually cuts strongly against what Congress intended when it first passed FIBA, which was that this statute and the insurance policies that are offered to Federal workers who are also State citizens should be subject to the State insurance regimes that have controlled these carriers from day one in the private sector. And when Congress has been asked to address specific problems in this area, it has reacted and responded repeatedly. The one thing that this agency here, OPM, has not done, as much as it's tried to argue for Chevron deference over an express – its interpretation of an express preemption clause, it has never in fact asked Congress to amend this law to address what it perceives as a problem. And I would point the Court in this – in this respect to the way preemption works under the Department of Defense insurance regime, because for all of the – again, the challenger is pointing to several copycat versions of this statute and several of their other insurance regimes. The Department of Defense insurance regime looks very different. What Congress did there is that it first enacted an express preemption clause that looked nearly identical to what the Court has in front of it here, and then five years later, it amended that law, and it delegated the power to preempt not to terms of a contract, but to regulations promulgated by a Federal agency. They're the Secretary of Defense. And I think if we're thinking about the democratically accountable ways that preemption should work and the protections that States must have for their own law, allowing either Congress to do the preempting or delegating that power specifically and expressly to an agency are the only two ways that we can – that are constitutionally permissible, and here we have neither. Congress itself does not control the terms of these contracts, and it has not expressly delegated any authority to the agency to pronounce on preemption. And so the agency's effort to seek Chevron deference over what is explicitly a conclusion on the scope of an express preemption clause just doesn't work. Congress well knows how, when it wants to, to delegate that power to the agency, and it has not done so here. If there are no further questions, I'll see you in the rest of my time. Roberts Thank you, counsel. Three minutes, Mr. Estrada. Estrada Thank you, Mr. Chief Justice. I'd like to start with the last point counsel made about how Congress did not expressly delegate the power to preempt. I will point out that this highlights one of the many oddities of the case on the other side. Under this Court's ruling in De La Cuesta, which held, you know, this Court held that an agency may use general rulemaking authority to preempt State laws, and in those circumstances, of course, their regulations get deference. And one of the contentions that this Court specifically rejected in De La Cuesta was that in order for the agency to use general rulemaking, Congress had specifically to specify that the power to preempt was one of the rules. That is at page 154 of this Court's opinion. The case is cited in page 54 of the blue brief. It's very odd, therefore, that under the conception that Respondent has, the agency could have done this conclusion on its own under its general regulatory power under 8913, and yet Congress cannot do so by expressly providing that this is the conclusion it wants. The second point I would like to make is that one that addresses Justice Breyer's point, which is, keep in mind that this is not a fight as to who gets the money in the first place. This is a class-action complaint brought in State court against my client on the theory that we were unjustly enriched by keeping the benefits that we should have paid him because we got him back. It is inconceivable to me that in the context of a case in which the gravamen of the complaint is we took his benefits back, the case could not be related to benefits. The relevant parts of the complaint are Joint Appendix 62a and 63a. The third point has to do with democratic accountability and whether you would leave this to agencies or bureaucrats as opposed to Congress. But as you recognize in the city of Arlington, the choice that is being proposed is not between Congress or the agency, but between the Federal courts, which are certainly unelected and generally unaccountable in the democratic process, and people that at least in theory are ultimately accountable to the elected representatives, that is to say an agency. And finally, to the extent that you believe that this statute has a constitutional doubt in the terms in which it was drafted, I can well believe that you have seen many cases in which you feel that you are the body shop for the roller derby across the street. This is not one of them. This requires no significant surgery. It is at most a little bit of buffing because it is certainly easier than concluding that something that Congress had expressly labeled a penalty in the Affordable Care Act was in fact a tax or the construction that the Court invoked in Namudno, Bond, and other cases. It is certainly easy here to read, shall supersede and preempt, to read, shall be effective notwithstanding, and give effect to the evident purpose of Congress, but it is not easy for Congress in dealing with these matters at the Federal level and not on a check board basis state by state. For all these reasons, we ask that the judgment of the Supreme Court of Missouri be reversed. Thank you very much. Thank you, counsel. The case is submitted.